# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# CHARLESTON DIVISION

Patrick Weckesser, on behalf of himself )
and all others similarly situated, )
) Civil Action No. 2:16-cv-02053-RMG
Plaintiff, )
)
v. ) **ORDER AND OPINION**
)
Knight Enterprises S.E., LLC, )
)
Defendant. )
)

This matter is before the Court on Plaintiffs' Motion to Strike settlement offers and for entry of a protective order (Dkt. No. 100). For the reasons set forth below, the Court grants the motion.

**I.  Facts**

Plaintiff Patrick Weckesser, a cable installation technician, filed this class and collective action on behalf of himself and all others similarly situated against Defendant Knight Enterprises S.E., LLC, alleging violations of the Fair Labor Standards Act ("FLSA") and the South Carolina Payment of Wages Act.[1] (Dkt. No. 1.) The Court granted conditional class certification on August 27, 2018. (Dkt. No. 36.) Multiple individuals have joined the case as Opt-In Plaintiffs. (See Dkt. Nos. 5, 8, 14, 46 – 61.)

The relevant facts that led to this motion are undisputed, except as otherwise noted. After the Parties unsuccessfully mediated the matter on May 2, 2019, Defendant decided to offer settlement to the plaintiffs individually. (Dkt. No. 103-6 at 6.) On June 18, 2019, Debbie Whittle

---

[1] Plaintiffs are no longer proceeding under the South Carolina Payment of Wages Act Claim and will not seek to certify a Rule 23 class action. (Dkt. No. 91 at 2 n.1.)

Durban, Defendant's counsel in this case, mailed Plaintiffs' counsel a cover letter stating that Defendant wanted to "make the enclosed settlement offers to each of your clients...." (Dkt. No. 102-2.) Behind the cover letter were individual "Offer[s] of Compromise," namely, thirty-four letters addressed to Plaintiff's counsel which included a settlement offer specific to each Plaintiff. (Dkt. Nos. 102-1; 103-8.) These Offers of Compromise ("Offer Letters") were signed by Jason Welz, the CEO of Defendant Knight Enterprises. (*Id.*) Notably, the Offer Letters contained the following language:

> As you know, Knight S.E. firmly believes that the Court will find that each and every person in this suit was properly classified as an independent contractor. In such event, it will seek recompense from each contractor who violated their express written agreement with Knight S.E. not to claim employee status.

(*Id.*) The Offers Letters went on to state that:

> Knight S.E. has analyzed the total number of jobs performed...for each workweek, the length of time for each job, and the earnings per week for the purpose of determining a realistic assessment of [the Plaintiff's] possible recovery should there be success on the classification issue.

(*Id.*) The Offer Letters then represent that the Plaintiffs' overtime "could not have exceeded" a specific number of hours and opine on what the plaintiff's "maximum claim" could be. (*Id.*) Unsurprisingly, the letters then proceed to offer each Plaintiff that alleged "maximum claim," plus 40% for attorneys' fees. (*Id.*) Upon acceptance, the letter states that both Parties will release each other from "all claims" arising up to June 14, 2019, the date of the letter. (*Id.*) The letters conclude by informing the Plaintiffs that, to accept the claim, they need to return a signed copy of the letter, though it will ultimately be subject to court approval, and that "[n]o other settlement offers will likely be made." (*Id.*) Notably, the letter does not indicate that Plaintiff should consult with an attorney before signing.

Plaintiffs' counsel responded by letter on June 27, 2019, alleging numerous deficiencies with the Offer Letters. (Dkt. No. 103-11.) Defendant contends that, on the same day, Welz became concerned that Plaintiffs' counsel never delivered the offer letters to the Plaintiffs, and directed Jill Williams, the Vice President of Human Resources for Jeffry Knight, Inc. ("JKI"), the parent company of Defendant, to call the Opt-In Plaintiffs. (Dkt. No. 103-7.) The following day, Williams called multiple Plaintiffs, asked whether they had received the settlement offers, informed them that Defendant had hired an expert to determine their allegedly unpaid wages, and sent many of the Plaintiffs[2] an email and a copy of the offer letter. The emails stated "[h]ere's a copy of that letter we sent to your lawyer," and informed the Plaintiffs that to accept they should sign two copies of the letter, and mail one copy to Defendant and the other to Plaintiff's counsel. (Dkt. No. 100-4 at 5 – 7.) Three Plaintiffs have since signed the offer letters. (Dkt. No. 103-8.)

In response to Plaintiffs' motion, Defendant is now taking the position that the offer letters "may have been unclear" regarding the scope of the release, and Defendant will seek to have Plaintiffs sign a separate "Proposed Settlement Agreement," which has yet to be sent, which only releases wage claims up to December 31, 2016. (Dkt. Nos. 103 at 11; 103-10.)

Plaintiffs contend this communication directly from Defendant to the Plaintiffs was improper, and asks the Court to strike the settlement offers, including the three already signed, and enter a protective order limiting future communications from the Defendant to the Plaintiffs. (Dkt. No. 100.) Defendant opposes the motion, contending that Williams, as an employee of Defendant

---

[2] Defendant contends that certain Plaintiffs "asked" for a copy of the offer letter during the phone call, Plaintiffs contend that Williams asked for their email addresses. (Dkt. No. 100-3 at ¶ 13; 100-4 at ¶ 8; 103-7 at ¶ 6.)

3

Knight and not counsel, was entitled to engage in party to party communications and, regardless, the content of the communications were proper.[3] (Dkt. No. 103.)

## II. Legal Standard

The Court has "the duty and broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). *See also Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989) (applying same reasoning to collective actions). Such control may include an "order limiting communications between parties and potential class members" to further the general principles of a collective action in federal court. *Gulf Oil Co.*, 452 U.S. at 99, 101. "[A]n order limiting communications between parties and potential class members should be based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. The order must be carefully drawn to limit speech "as little as possible." *Id.* Court may also order other remedies, as appropriate. *Id.* at 104.

In a test applied by district courts in the Fourth Circuit, the Court should be satisfied that "(1) 'a particular form of communication has occurred or is threatened to occur' and (2) 'the particular form of communication at issue is abusive in that it threatens the proper functioning of the litigation.'" *Ross v. Wolf Fire Protection, Inc.*, 799 F.Supp.2d 518, 526 (D.Md.2011) *citing Cox Nuclear Med. v. Gold Cup Coffee Servs., Inc.*, 214 F.R.D. 696, 697 – 98 (S.D.Ala.2003). "Abusive practices that have been considered sufficient to warrant a protective order include communications that coerce prospective class members into excluding themselves from the

---

[3] After briefing on this motion was complete, Plaintiffs informed the Court that Defendant had sent an additional communication to the Opt-In Plaintiffs dated July 17, 2019, offering payment to settle the claims. (Dkt. No. 107.) The Court invalidated those offers and entered a protective order on communications pending the outcome of this Motion.

litigation; communications that contain false, misleading or confusing statements; and communications that undermine cooperation with or confidence in class counsel." *Cox Nuclear Med.*, 214 F.R.D. at 698. *See also Randolph v. PowerComm Const., Inc.*, 41 F. Supp. 3d 461, 465 (D. Md. 2014) (same); *Ross*, 799 F. Supp. 2d at 526 (same).

## III. Discussion

The Parties have submitted briefs supported by extensive documentary evidence and signed affidavits, and have thus provided the Court with a clear record to find that the Defendant's conduct was clearly impermissible and the Court must take appropriate actions to govern the conduct of the Parties. (Dkt. Nos. 100, 102, 103, 106, 107.)

First, it is undisputed that a "particular form of communication" has occurred here. Defendant, through Williams, contacted at least seventeen of the opt-in plaintiffs via phone,[4] and also emailed many of them the Offer Letters. (Dkt. No. 103-7 at ¶¶ 5 – 6.) The Plaintiffs contend that these communications were improper and warrants a protective order as they were coercive and misleading. (Dkt. No. 100-1 at 4.)

Second, the Court finds that the communications complained of were abusive and threaten the proper functioning of this litigation. The FLSA was created in recognition of the "unequal bargaining power as between employer and employee...." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 706 (1945). The communications at issue here highlight the inequality of that bargaining power, inducing represented plaintiffs, all of whom are current or former workers of Defendant, to settle their claims based on a threat of potential future legal action and a potentially inaccurate assurance by Defendant that the settlement offered represents their maximum possible compensation even if they proceed to trial.

---

[4] Williams spoke with fourteen plaintiffs, and left messages for three. (Dkt. No. 103-7 at ¶ 5.)

5

To begin with, the communication at issue here, as acknowledged by Defendant, was inherently "false, misleading" and "confusing." *See Cox Nuclear Med.*, 214 F.R.D. at 698; *Randolph*, 41 F. Supp. 3d at 465; *Ross*, 799 F. Supp. 2d at 526. Defendant now concedes that some of the language in the letters, specifically regarding the nature and term of claims released, "may have been unclear," and now contend that they seek to have the Opt-In Plaintiffs who wish to settle their claims sign an additional "Proposed Settlement Agreement," which Defendant has not yet presented to the Opt-In Plaintiffs because of this pending motion. (Dkt. No. 103 at 9 n.5, 11 – 12.) However, the terms of the yet-unsent Proposed Settlement Agreement, releasing only wage claims through December 31, 2016, are directly in conflict with the Offer Letters' statement that "all claims arising out of any matter occurring prior to the date of this letter" will be released. (Dkt. Nos. 103-8; 103-10 at 3 – 4.) These Offer Letters, which Defendant acknowledges are overbroad, therefore have the coercive effect of leading the Plaintiffs to believe they can never bring any other form of claim against Defendant.[5] Indeed, separate from the Defendant's acknowledgement of the mistake, this broad release on its own was impermissible and misleading. *Robinson v. Harrison Transportation Servs., Inc.*, No. 5:15-CV-298-F, 2016 WL 3647616, at *4 (E.D.N.C. June 30, 2016) ("[A]n employer is not entitled to use an FLSA claim ... to leverage a release from liability unconnected to the FLSA.") *quoting Moreno v. Regions Bank*, 729 F. Supp. 2d 1346, 1351 (M.D. Fla. 2010).

---

[5] The release of any matter "prior to the date of this letter" also has the likely misleading effect of inducing the Plaintiffs to believe they cannot bring claims against Defendant's parent company, JKI, who many of the Plaintiffs began working for on January 1, 2017 after Defendant substantially ceased operations. Defendant also attempts to distinguish *Potts v. Nashville Limo & Transp., LLC*, No. 3:14-CV-1412, 2016 WL 1622015, *15 (M.D. Tenn. Apr. 19, 2016), where the defendant did not inform the plaintiffs they could review the release. Yet, asking the Plaintiffs sign an Offer Letter without providing notice that a second settlement agreement will ultimately need to be signed is substantially the same: both prevent the Plaintiffs from knowing what they ultimately are agreeing to in order to secure consideration.

Defendant additionally provided the Plaintiffs with the hollow assurance that the settlement offer amounted to the "maximum claim for overtime compensation[,]" and that the settlement offer was merely to "avoid unnecessary litigation costs." (Dkt. No. 103-8.) Yet, as demonstrated by the Parties' briefing, the Parties have a genuine dispute regarding the correct way to calculate work hours, and instead the Defendant relied on the individual Opt-In Plaintiffs lack of knowledge of the underlying record, documents in discovery, and applicable law to attempt to circumvent their decision to have settlement calculations handled by their chosen counsel. Indeed, while Defendants attempt to distinguish the case, the court in *Potts*, 2016 WL 1622015 similarly faulted a defendant attempting to engage in direct settlement negations with opt-in plaintiffs who failed to "show[], or even offer[] to show, the class members the documents that he claimed demonstrated they were paid correctly." *Id.* at *7, *15. Here, too, the Opt-In Plaintiffs had no way to assess their claims or the truth of Defendant's statements, and Defendant relied on disputed assertions stated as fact to convince the Plaintiffs into signing the offer letters.[6]

This misinformation was compounded by a threat contained in second paragraph of the letter: if the Plaintiffs did not sign the agreement, and Defendant prevailed at trial, the Defendant would sue the Plaintiffs for indemnification since their Plaintiffs' contracts allegedly stated they would not seek employee status. (Dkt. Nos. 103-8.) Multiple courts have recognized that these types of claims, indemnification for bringing a FLSA action, are impermissible and erode the protective purpose of the FLSA and deter plaintiffs from vindicating their rights. *See Fernandez*

---

[6] Indeed, this knowledge imbalance, with many Opt-In Plaintiffs not having taken direct part in discovery, in addition to the other issues detailed in this Order, would also prevent the Court from determining that the Offers Letters are "fair" or "reasonable" as required if ultimately presented to the Court for approval. *See Irvine v. Destination Wild Dunes Mgmt., Inc.*, 204 F. Supp. 3d 846, 849 (D.S.C. 2016) (to assess whether a FLSA settlement is "fair" and "reasonable" a court assess, in part, "the extent of discovery that has taken place" and "the absence of fraud or collusion in the settlement[.]")

7

*v. Kinray, Inc.*, No. 13CV4938ARRSMG, 2014 WL 12778829, at *7 (E.D.N.Y. Feb. 5, 2014) ("I agree with plaintiffs that defendants should not be able to use the indemnification provision in the Agreement as an 'end run' around this scheme…. Requiring plaintiffs to indemnify defendants for the costs of litigating an unsuccessful FLSA claim would deter plaintiffs from bringing suit in the first place.") (collecting cases). Further, the Fourth Circuit has recognized that such a lawsuit, ultimately, could constitute unlawful retaliation under the FLSA. *See Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008) ("Our conclusion accords with that reached by our sister circuits. The Tenth Circuit has held that an employer's third-party complaint for indemnity against four former employers could, as a matter of law, qualify as unlawful retaliation under the FLSA.") *citing Martin v. Gingerbread House, Inc.*, 977 F.2d 1405, 1406–08 (10th Cir.1992). Yet, regardless of whether such an indemnification claim can ultimately be brought,[7] the issue here is not whether Defendant can state a cause of action for indemnification. Instead, the Court finds it coercive that the Defendant, in a letter sent directly to already-represented Plaintiffs, threatened potentially retaliatory litigation if the Plaintiffs failed to settle their claims immediately. This is an independently sufficient ground to find that communication was impermissibly coercive.

The Court also finds that Defendant's recent actions demonstrate that, even after this Motion was filed, Defendant continued to engage in communications that "threaten the proper functioning of the litigation." Notably, after this Motion was filed, and after Defendant represented that it had delayed sending settlement agreements to Plaintiffs based on the pending motion (Dkt. No. 103 at 9 n.5), Defendant sent an additional letter to Opt-In Plaintiffs requesting that they settle

---

[7] Defendant has identified some cases supporting the idea that an indemnification counterclaim can be brought concurrent with a FLSA suit. *See Dobbins v. Scriptfleet, Inc.*, No. 8:11-CV-1923-T-24, 2012 WL 2282560, at *2 (M.D. Fla. June 18, 2012). Here, however, the issue is not whether an indemnification can survive but rather whether a threat to sue is permissible in a letter to represented Opt-In Plaintiffs to induce settlement.

their claims. (Dkt. No. 107.) The letters included an opt-out form and check. (*Id.*) This type of repeated communication, even after multiple Plaintiffs decided to not accept Defendants' offers communicated via letters, emails and phone calls less than three weeks ago, are an impermissible repeated attempt to circumvent Plaintiffs' chosen representatives and independently necessitates a finding that Defendant's repeated communications were abusive.

Finally, Defendant argues that it was contacting the Opt-In Plaintiffs, in part, because Defendant was concerned that Plaintiffs' counsel had not informed their clients of the settlement offers. (Dkt. No. 103 at 3 – 4.) Defendant contends this was necessary as Rule 1.2(a) of the South Carolina Rules of Professional Conduct ("SCRPC") commits to a client the right to accept an offer of settlement. Yet, this argument ignores that fact that Comment 3 permits clients to "authorize…lawyer[s] to take specific action on [their] behalf without further consultation," and Comment 2 to Rule 1.4, specifically permits attorneys to accept or reject offers on a client's behalf where "the client has previously…has authorized the lawyer to accept or to reject the offer." Here, the Opt-In Plaintiffs' notice of joinder explicitly permitted Plaintiffs' counsel to "make all decisions with respect to the conduct and handling of this action, including the settlement thereof," and Plaintiffs' counsel thus comported with their ethical duties. (Dkt. Nos. 46 – 61.) Nonetheless, Plaintiffs represent that the settlement determinations were made with a steering committee consisting of the Named Plaintiff and two Opt-In Plaintiffs. (Dkt. No. 100-1 at 1.) Defendant's ethical arguments that their communication was mandated by the SCPRC is therefore without merit.

Yet, the Court is concerned by the implications of Defendant's actions in light of other duties articulated by the SCPRC and ABA. First, while Defendant correctly notes that a client can revoke such authority to accept settlement at any time under Rule 1.2, it does not follow that an

opposing party, in settlement negotiations, can induce a represented party to withdraw that consent. *See Cox Nuclear Med.*, 214 F.R.D. at 698 (holding that "communications that undermine cooperation with or confidence in class counsel" may necessitate a protective order). Further, Defendant's argument flips a client's ability to withdraw consent on its head: here, the Opt-In Plaintiffs sought to bring this case collectively and negotiate collectively. Defendant's argument would transfer to Defendant the ability to void the Opt-In Plaintiff's consent simply by sending individual settlement offers.

More fundamentally, the Court is troubled by the nature of the party to party communications here. Defendant is correct that a party is permitted to contact another party in a proceeding, including regarding settlement. *See, e.g.*, ABA Formal Op. 11-461 ("It sometimes is desirable for parties to a litigation or transactional matter to communicate directly with each other even though they are represented by counsel. Two examples may be where the parties wish to cement a settlement or break an impasse in settlement negotiations.") Further, a lawyer can provide assistance to a client regarding the nature of those communications. *Id.* Yet, the ABA and this Court are cognizant of ethical concerns when assisting party to party communications, as under Rule 4.2 a lawyer is not permitted to contact a represented party and, similarly, Rule 8.4 prohibits an attorney from using an agent to breach this rule. Therefore, the ABA, at the end of its' Formal Opinion cited by Defendant, advised attorneys that they must "at a minimum, advise [the] client to encourage the other party to consult with counsel before entering into obligations, making admissions or disclosing confidential information." ABA Formal Op. 11-461. The Opinion goes on to state that if counsel drafted the proposed agreement, they should "include in such agreement conspicuous language on the signature page that warns the other party to consult with his lawyer before signing the agreement." *Id.* It is unknown who drafted the Offer Letters

here. Nonetheless, noticeably absent from the letter is any recommendation that the Opt-In Plaintiffs' consult with their counsel. While Defendant argues this was permissible as the letters had initially be sent to Plaintiffs' counsel (Dkt. No. 103 at 6), by the time Williams emailed the letters directly to the Plaintiffs, Defendant believed that each Plaintiff had not consulted with counsel regarding the proposed settlement. This failure to advise the Plaintiffs to consult with counsel, as in *Potts*, similarly necessitates a protective order.

The Court therefore finds, based on clear evidence in the record, that the Plaintiffs have demonstrated that a particular communication occurred and that the communication was abusive in that it threatens the proper functioning of the litigation. The Court therefore will take appropriate actions to remedy these communications. First, the Court invalidates and strikes all offer letters, opt-out forms, and settlement checks submitted to Opt-In Plaintiffs and invalidates all offer letters, opt-out forms or settlement checks signed by Opt-In Plaintiffs.[8] Second, within seven (7) days of this Order, Plaintiffs' counsel shall draft a corrective notice to all those who signed any document settling their claims or opting out of the litigation that informs the Opt-In Plaintiffs that they remain a party to the litigation and to consult with their counsel if they have questions regarding this litigation. Once approved, Defendant must send via mail and e-mail, at their expense, the notice to any Opt-In Plaintiffs who signed the offer letters. Finally, the Court is cognizant that any protective orders should be drawn as carefully and narrowly as possible in order to only prohibit future abuses. Therefore, the Court will grant a protective order and prohibit Defendants, their employees, and agents from communication by telephone, email, in person or any other means with the Named Plaintiff, Opt-In Plaintiffs and their family members regarding

---

[8] The Court also notes that it would not approve these signed settlements, as the Court finds that the offer letters, and the process surrounding the Opt-In Plaintiffs signing them, were not fair or reasonable.

11

the pending lawsuit, settlement, their decision to participate as plaintiffs, or their representation. *See Randolph*, 41 F. Supp. 3d at 467.

**IV.** **Conclusion**

For the reasons above, the Court **GRANTS** Plaintiffs' Motion to Strike settlement offers and for entry of a protective order (Dkt. No. 100). The Court **STRIKES** all offer letters, opt-out forms, and settlement checks submitted to Opt-In Plaintiffs and all offer letters, opt-out forms, and settlement checks signed by Opt-In Plaintiffs. The Court **ORDERS** that within **SEVEN (7) DAYS** of this Order, Plaintiffs' counsel shall submit a draft a corrective notice to the Court, consistent with this Order. Once approved, Defendant must send via mail and e-mail, at their expense, the notice to any Opt-In Plaintiffs who signed an Offer Letter or an individual settlement document. Finally, the Court **ORDERS** that Defendant, its employees, or its agents, **SHALL NOT** communicate by telephone, email, in person or via any other means with the Named Plaintiff, Opt-In Plaintiffs and their family members regarding the pending lawsuit, settlement, their decision to participate as plaintiffs, or their representation.

**AND IT IS SO ORDERED.**

Richard M. Gergel
United States District Court Judge

July 22, 2019
Charleston, South Carolina